**UNITED STATES of America,**
**Plaintiff,**

v.

**Howard J. NYGARD, Jr., Defendant.**

**No. 6173.**

United States District Court,
W. D. Missouri, S. D.

April 9, 1971.

864

Bert C. Hurn, U. S. Dist. Atty., Paul Anthony White, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

O. J. Taylor, Springfield, Mo., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

### I.

This case, involving an alleged violation of Sections 5861(c), 5861(d), and 5861(i), Title 26, United States Code, proscribing the possession of an unregistered firearm, was tried without a jury. The parties agreed that the evidence

should be considered in regard to both the merits and defendant's Rule 41(e) motion to suppress evidence. We deem it appropriate to state the reasons why we must return a verdict of not guilty in a case in which it is apparent that, except for a violation of Rule 5(a) of the Rules of Criminal Procedure, a conviction would have been obtained.

Whether a verdict of guilty or not guilty should be entered turns on the question of whether defendant's objection to the admission of the unregistered gun in evidence should be sustained. Defendant's objection was based upon (a) an alleged violation of the Fourth Amendment and (b) an alleged violation of Rule 5(a) of the Rules of Criminal Procedure. The first ground of the objection is not well taken. The second ground is valid. Defendant's objection must therefore be sustained and the defendant acquitted.

## II.

The following factual circumstances were established, for the most part, by contemporaneous documentary evidence, corroborated by the undisputed testimony of the witnesses:

At 2:33 a. m. on the morning of September 25, 1970, at the request of Detective Brogan of the Nassau County, New York, Police Department, the Missouri Highway Patrol and the Police Department of Cabool, Missouri, were sent the following message:

Missing from 19 Norwood Road Manorhaven NY Howard J. Nygard Jr. M–W–25–5–10–170–DOB 080145 blue eyes long black hair moustache fair complexion physical good mentally depressed reported by mother Mary same address phone home 516–883–4348 business 516–535–3000 wearing dungarees black and maroon striped shirt sandles carrying $200.00 U.S. currency. Subject should be considered dangerous and approached with caution mentally poor alleged to have pistol in possession and has threatened to use same on father

Subject believed to be in route to Route 60 Highway M Cabool Missouri operating a 1968 Camaro color blue N.Y. registration 7214XG subject attempting to contact father Howard J. Nygard Sr. at above address who possibly took subjects younger brother Donald age 13 years from this area— Donald is subject of Nassau County missing person alarm 19059.

That message was received by the Missouri Highway Patrol at 2:35 a. m. on September 25, 1970. At 2:51 a. m. on the same day the message was radioed to the Weight Station maintained by the Highway Patrol near Cabool, Missouri, for eventual delivery to the Cabool police department. A member of the Missouri Highway Patrol at the Cabool Weight Station delivered the message, which he had copied down in longhand, to Patrolman Kelly, a member of the Cabool Police Department, at 3:40 a. m. on September 25, 1970. Patrolman Kelly put the longhand message on a clipboard kept in the Cabool Police Department's patrol car. He also made a note on his daily report, which is routinely reviewed by the police officer who succeeds him on duty, that "Howard Nygard, Jr. coming in from N.Y. 1968 Camaro Lic. #7214XG. Supposed to try to kill his father. Armed & dangerous. Received our Dept. 3:40 A.M."

Patrolman Ward and Chief of Police Tucker of the Cabool Police Department became advised of both the message on the clipboard and the notation made by Patrolman Kelly in the officer's daily report when they came on duty later in the day of September 25, 1970. The official arrest report of the Cabool Police Department, dated September 25, 1970, prepared and signed by both Patrolman Ward and Chief of Police Tucker stated the following:

Subject had been reported enroute from New York to Cabool, Mo. for the purpose of killing his father. Subject reportedly was armed and dangerous. Subject when apprehended was armed with above weapon but offered little resistance to police officers. Subject

stated that his purpose here was to originally kill his father with the above mentioned weapon, but that he had changed his mind. Subject incarcerated in Cabool City Jail pending investigation of possible felony charges stemming from the possession of above named weapon.

Those officers described the weapon involved in the alleged concealed weapon offense as a:

22 cal. Rifle modified by sawing stock and barrel off. Gun measured less than 13 inches overall length.

The defendant was in a public telephone booth a substantial distance from his parked automobile at the time of his arrest. There were some unimportant variations in the testimony of the two Cabool police officers and that of the defendant in regard to the details of that arrest and the seizure of the gun.[1] Everyone agreed, however, that because of the tight-fitting sport clothes the defendant was wearing, it was clearly apparent to both arresting officers that he did not in fact have a weapon concealed on his person. It was also clearly apparent to the arresting officers that if the defendant was in fact carrying a weapon it would have to be in the automobile.

### III.

The warrantless search involved in this case was valid if (a) the defendant consented and thereby waived the necessity for any warrant which may have otherwise been required; or (b) the arresting officers had probable cause to search the automobile and therefore a warrant was not required under the circumstances. The primary thrust of the Government's effort to sustain the search was primarily focused on the consent ground. We made an express factual finding at the close of the case (Tr. 193–195) that it could not fairly be said that the defendant had in fact consented to the search.

Haire v. Sarver, 437 F.2d 1262, decided by the Eighth Circuit on February 5, 1971, makes clear that: "The consent to search is ordinarily a question of fact." We have not changed our mind in regard to the proper inferences to be drawn from the essentially undisputed testimony and therefore adheres to the finding made at trial on the issue of consent.

The fact, however, that defendant did not in fact consent to the search of his automobile does not, under the circumstances of this case, mean, that the Cabool police officers' search and seizure of the gun from under the driver's seat in defendant's automobile was in violation of the Fourth Amendment. Indeed, that police officer had a right to make that search without defendant's consent and without violating the Fourth Amendment if, under the factual circumstances, he had probable cause to do so. Such is the explicit ruling of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). See also United States v. Harflinger, (8th Cir., 1970) 436 F.2d 928, an appeal from this district, for a recent application of the principles enunciated in Chambers v. Maroney.[2]

---

1. For example, the defendant testified that after the arrest he was taken to the jail (a very short distance away) and given a *Miranda* warning before his car was searched whereas both police officers testified that the warning was given immediately before the search and before the defendant was taken to jail. That, and other similar variations are irrelevant because, under the applicable law, it was quite immaterial whether defendant was ever warned because, under the factual situation presented, the Cabool police officers had probable cause to search the car.

2. Whiteley v. Wyoming Penitentiary Warden, 401 U.S. ——, 91 S.Ct. 1031, 28 L.Ed. 2d 306, decided March 29, 1971, is not inconsistent with Chambers v. Maroney. *Whiteley* recognized that police officers are "entitled to act on the strength of [a] radio bulletin." The difficulty in *Whiteley* was that the sheriff obtained an arrest warrant and put an arrest bulletin on the teletype solely on the basis of

■ We find and conclude, under principles articulated in Chambers v. Maroney that the state law enforcement officers had probable cause to arrest the defendant and to thereafter make a warrantless search of the automobile for a violation of Missouri law. The Cabool police officers in fact had information that the defendant was "alleged to have pistol in possession and has threatened to use same on father," as stated in the teletype from New York. Identification of the defendant presented no problem because Chief Tucker was acquainted with him. Failure to apprehend defendant under the circumstances would have constituted a failure of official duty.

■■ At the time of the defendant's arrest it was obvious to the arresting officers that the gun was not on his person. The officers had probable cause to search the car to determine whether defendant was in fact carrying a concealed weapon within the meaning of Missouri law. Section 564.610, V.A.M.S., forbids any person to "carry concealed *upon or about his person* a dangerous or deadly weapon." The words "upon or about his person" have been read by the Missouri courts to mean the concealment of a gun "in such close proximity to the accused as to be within his easy reach and convenient control," State v. Conley, 280 Mo. 21, 217 S.W. 29. A gun carried under the front seat of an automobile has been held by the Missouri courts to be a violation of the statute. See State v. Tate, Mo., 416 S.W.2d 103; State v. Holbert, Mo., 420 S.W.2d 351; and State v. Tillman, Mo., 454 S.W.2d 923. It is thus apparent that the Cabool police officer had probable cause to look under the driver's seat of the car to see if there was in fact a concealed gun and, if so, to seize it.

## IV.

Had either the State of Missouri or the United States elected to proceed with a timely prosecution, conducted in accordance with applicable procedural requirements, no valid objection could have been made to the admission of the gun in evidence in either a state or federal prosecution. But neither jurisdiction elected to do so.

This case demonstrates, perhaps better than most, that the relevant factual circumstances concerning the validity of the actions of law enforcement officers are usually established by contemporaneous documentary evidence. The failure of federal law enforcement officers immediately to assemble and carefully review that documentary evidence before authorizing federal prosecution often results in the ineffective administration of justice.[3]

In regard to defendant's objection grounded on an alleged violation of Rule 5(a), the contemporaneous documentary evidence established that defendant's arrest was promptly reported to other law enforcement authorities. The Missouri Highway Patrol, on behalf of the Cabool Police Department, at 10:03 p. m. on September 25, 1970, the day of defendant's arrest, sent the following wire (Exhibit 5–C) to the Nassau County, New York, Police Department:

19076 Sept 25 Howard J Nygard Jr in custody this department advise rush any charges your department and extradition information for your infor-

an uncorroborated informer's tip. He therefore lacked probable cause.

It is clear that in this case Detective Brogan, in contrast to the sheriff involved in *Whiteley*, had probable cause in that he acted upon first hand information obtained from the defendant's mother who had personal knowledge of defendant's possession of the gun and of his intent to go to Missouri (Tr. 48–49).

3. The same thing is true in regard to the trial of any case in which the validity of state searches and seizures is in dispute. Portions of two days were devoted to hearing the evidence in this non-jury case. The Government commenced trial without having collected all available documentary evidence relating to defendant's arrest and custody. (Tr. 63, 65, 84, 143, 160). Had that evidence been in court at the outset this case probably could have been tried in less than an hour.

mation subject was armed with rifle cut down into pistol length

The Cabool Police Department's officer's daily report for Saturday, September 26, 1970, shows the following:

Notified F.B.I. of Nygard apprehension. They will contact Chief Tucker 9–27–70 about charges on him. Took Nygard to Houston *to hold for F.B.I.* and our chgs. [Emphasis ours].

That notation and the inferences to be drawn from the undisputed testimony of the witnesses established that the state and federal authorities entered into a working arrangement on September 26, 1970, under which the defendant would be held in custody at least until the state authorities heard further from the federal authorities on the Sunday following defendant's Friday arrest. On Saturday, September 26, 1970, pursuant to that understanding, defendant was removed from the Cabool jail and taken to the jail in Houston, Missouri "to hold for F.B.I."

All law enforcement officers knew that at the time defendant was taken to the Houston County jail no charges were pending against the defendant by the State of New York. Exhibit 5–C and

the testimony of the witnesses established that Detective Brogan so advised the Missouri authorities by telephone in response to the September 25, 1970 telegram which had requested the Nassau County, New York, Police Department to "rush any charges your department and extradition information."

■ All law enforcement officers, both state and federal, also knew that defendant could not lawfully be held in state custody longer than 20 hours after 6:30 p. m. of September 25, 1970, the time and date of his warrantless arrest, unless some state warrant was in fact issued by a judicial officer subsequent to his arrest or unless the defendant was in fact charged with some state criminal offense within that time.[4] The 20 hour period within which the defendant could have been lawfully detained expired at 2:30 p. m. on Saturday, September 26, 1970, without the issuance of a subsequent state warrant and without the filing of a state charge. Any claim of lawful detention by the state authorities beyond that time is untenable.

■ It is therefore apparent that defendant was being held in custody at all times subsequent to 2:30 p. m. on Satur-

---

4. Rule 21.14 of the Missouri Rules of Criminal Procedure, V.A.M.R. provides in part that: "All persons arrested and held in custody by any peace officer, without warrant, for the alleged commission of a criminal offense, or on suspicion thereof, shall be discharged from such custody within twenty hours from the time of arrest, unless they be held upon a warrant issued subsequent to such arrest. While so held in custody, every such person shall be permitted to consult with counsel or other persons in his behalf." Exactly the same language is reiterated in Rule 37.17 of the Missouri Rules of Criminal Procedure.

Section 544.170, of V.A.M.S. provides in part that: "All persons arrested and confined in any jail, calaboose or other place of confinement by any peace officer, without warrant or other process, for any alleged breach of the peace or other criminal offense, or on suspicion thereof, shall be discharged from said custody within twenty hours from the time of such arrest, unless they shall be charged with a criminal offense by the oath of

some credible person, and be held by warrant to answer to such offense; and every such person shall, while so confined, be permitted at all reasonable hours during the day to consult with counsel or other persons in his behalf; * * *."

It is well known that the Missouri 20 hour limit is generally complied with by all Missouri law enforcement officers, absent some unusual and exceptional circumstance, because Section 544.170 V.A. M.S. provides that: "Any person or officer who shall violate the provisions of this section [establishing the same 20 hour limit established by Missouri Rules 21.14 and 37.17], by refusing to release any person who shall be entitled to such release, or by refusing to permit him to see and consult with counsel or other persons, or who shall transfer any such prisoner to the custody or control of another, or to another place, or prefer against such person a false charge, with intent to avoid the provisions of this section, shall be deemed guilty of a misdemeanor."

day, September 26, 1970, solely for the benefit of the federal law enforcement authorities who, according to the understanding, were obligated to promptly take the defendant into federal custody and thereafter to proceed in accordance with the requirements of Rule 5(a).[5]

The federal authorities, however, apparently proceeding on the erroneous notion that illegal detention by the state authorities under the working arrangement could not prejudice the anticipated federal criminal case, did nothing about assuming custody of the defendant until October 8, 1970. On that day a federal complaint was filed before the United States Commissioner in Springfield, Missouri. On October 9, 1970, the United States Marshal accepted custody of the defendant and transported him from the Houston County jail to Springfield. Defendant was not brought before a United States Commissioner until 12 days after the Government had conclusively determined on September 27, 1970, that federal law had been violated. During that time the defendant was not afforded an opportunity to make bail under the Bail Reform Act. Indeed, he was not able to do so until October 19, 1970, when Judge Collinson reviewed the bail initially set by the Commissioner.

The defendant testified without contradiction that during the time he was held in the Houston County jail he was not allowed to make a telephone call until he "spoke to a judge in the Texas County Court House" (Tr. 22). Apparently, he was granted permission to telephone Detective Brogan in New York on September 30, 1970. There is no other apparent explanation for the telegram sent September 30, 1970 (Exh. 5–B) by the Nassau County, New York, Police Department to Chief of Police Tucker to advise "AS TO STATUS [of the defendant] RUSH REPLY NEEDED."

Exhibit 5–D, the Missouri Highway Patrol's immediate reply on September 30, 1970 to the Nassau County, New York, Police Department's urgent inquiry stated: "HOWARD J. NYGARD, JR. HELD TEXAS COUNTY JAIL. BELIEVE ON FEDERAL CHARGES ON SAWED OFF RIFLE."

On September 30, 1970 attention was thus focused on the fact that the defendant was being unlawfully detained in the Houston County jail without any charge against him by any jurisdiction. The State of Missouri filed a state concealed weapon charge against the defendant on September 30, 1970. The belated filing of that charge could not, of course, legitimate defendant's unlawful custody which commenced on the expiration of the 20 hour limitation.

The Government came into physical possession of the gun on September 27, 1970 during the period of time defendant was unquestionably being illegally detained in the Houston County jail pursuant to the working arrangement between the state and federal law enforcement officers. From the time defendant was held in custody beyond the 20 hour limit, such custody must be considered federal custody and the federal officer's failure to take the defendant before a United States Commissioner without unnecessary delay must be considered a violation of Rule 5(a).

The testimony of the responsible federal officer establishes that he erroneously assumed that the defendant was lawfully in state custody at the time he seized the car and obtained the gun as evidence to be adduced in a later federal prosecution.[6] The record establishes

---

5. The Cabool police department records show that on Monday, September 27, 1970, Patrolman Ward "met with F.B.I. on Nygard." More important, the same notation added: "They will be back for him. They took his car and will file warrant."

6. The testimony of the officer was as follows:
   THE COURT: How quickly did you take him before a United States Commissioner after you determined that there had been a violation of federal law?

that there was no valid excuse for making such an assumption in light of his telephone calls and subsequent conferences with the arresting state officers and the defendant. Except for the working arrangement established between the state and federal officers, we must assume that the state authorities would have followed the applicable state law and that the defendant would have been released at 2:30 p. m. on September 26, 1970, and his possessions, including the gun, would have been returned to him. Under those circumstances, the federal authorities would have been required to obtain their evidence in a manner quite different from the manner in which they came into possession of their evidence in this case.

The undisputed relevant circumstances establish that state prosecution was initially deferred because the state authorities recognized immediately after defendant's arrest the probability of a federal charge.[7]

The Government argues that "nowhere in the record does it appear that the defendant was being held at the instance of or at the request of federal officers" (Govt.'s Brief, p. 9). We find and conclude that, to the contrary, the only conclusion supported by the record is that the defendant *was* in fact being held at the instance and request of federal officers. It would be most improper to conclude that the state authorities would not have released the defendant and returned his property to him in accordance with Missouri Rules 21.14 and 37.17 and Section 544.170, V.A.M.S., unless they had an apparently good reason to do so.

We think it clear that the state authorities relied upon the working arrangement and assurances reflected in the official entries made in the daily reports of the Cabool Police Department. The entries made on September 26 and 27, 1970 show that the state authorities were to hold the defendant pending the prompt filing of federal charges and that the federal officers would "be back for him [the defendant]." They also show that the state officers understood that the federal officers "will file warrant."

### V.

Elkins v. United States, 364 U.S. 206 at 221, 80 S.Ct. 1437, at 1446, 4 L.Ed.2d 1669 (1960), emphasizes that "free and open cooperation between state and federal law enforcement officers is to be commended and encouraged." All persons interested in proper law enforcement agree. But *Elkins* made clear that cooperation between state and federal law enforcement officers must be consistent with law, else the evidentiary product of such cooperation must be held to be inadmissible in the trial of a federal criminal case. In *Elkins,* the silver platter case, the considerations of ju-

THE WITNESS: The warrant was issued on the 8th of October, Your Honor.
THE COURT: And when did you make the seizure of this automobile?
THE WITNESS: On September 27th.
THE COURT: So that you had determined that there had been a violation of law on September 27th?
THE WITNESS: Yes, sir.
\* \* \* \* \*
THE COURT: Are you familiar with the requirements of the Federal Rules of Criminal Procedure as to how promptly one charged with violation of federal law is to be brought before a United States Commissioner?
THE WITNESS: Yes, sir; however, I thought that I had not arrested him at this time, Your Honor.

THE COURT: Well, was he free to go back to New York?
THE WITNESS: He was in state custody, Your Honor. [Tr. 123–124]

7. The Cabool police officers' daily report for September 25, 1970, the day of defendant's arrest, showed that they recognized that the "22 cal. rifle [was] cut to illegal federal rule." Their official records for the next day show that the F.B.I. had been notified and that the federal authorities would "contact Chief Tucker 9–27–70 about charges." Accordingly, on September 26, 1970, the state authorities "took Nygard to Houston to hold for F.B.I. \* \* \*"

dicial integrity articulated almost thirty years ago in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), were applied to exclude from a federal trial evidence turned over to federal officers by state officers which had originally been obtained by those state officers in violation of the Fourth Amendment.

*Elkins* relied in part upon Mr. Justice Brandeis' famous dissent in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), in which he said "Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." [364 U.S. at 223, 80 S.Ct. at 1447].

The Government does not suggest how courts can maintain long established principles of judicial integrity reiterated in *Elkins* and at the same time overlook the fact that a violation of Section 544.-170 is a criminal offense under the law of Missouri.

The Government does not attempt to explain why a federal officer, fully convinced of a violation of federal law as evidenced by his administrative seizure of an automobile, failed to assume immediate custody of the defendant and, in compliance with Rule 5(a) of the Rules of Criminal Procedure, take him before a United States Commissioner without unnecessary delay.

Indeed, that federal officer was authorized by federal law to take the defendant before either the State Circuit Judge, State Probate Judge, or State Magistrate, all of whom had offices in the same building in which that officer interviewed the defendant on September 27, 1970. See Section 3041, Title 18, United States Code, and the discussion of that statute in § 41, n. 10, and § 71 n. 2 of Wright, Federal Practice and Procedure.

## VI.

The Government contends that the fact Rule 5(a) may have been violated does not affect the admissibility of the gun in evidence in this case. The Government argues that even if it is determined that what it calls the *"McNabb-Mallory"* rule may have been violated, the only "consequence [of such a violation] would be to exclude statements made by the defendant during the period of unlawful confinement in violation of Rule 5(a)." (Govt.'s Brief, 1 p. 10).

It was in 1958 that the late Judge Ridge of this Court stated the following in United States v. Tupper, (W.D.Mo., 1958) 168 F.Supp. 907 at 910:

> It has long been a rule in respect to federal criminal prosecutions, that where a federal officer participates officially with state officers in an arrest, detention, or search, so that in substance and effect it is their joint operation, the legality of the arrest, detention and search is to be measured and determined by federal law and the fruits thereof cannot be used in evidence in a federal prosecution as it is deemed to be the undertaking exclusively of the federal officers. Anderson v. United States, *supra* [63 S.Ct. 599, 87 L.Ed. 829]; Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293; Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520.

Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943), relied upon in *Tupper*, "presented serious questions in the administration of federal criminal justice" which were "similar to those decided this day in No. 25, McNabb v. United States," (Id. at 351, 63 S.Ct. at 599]. *McNabb*, of course, involved activities of federal officers in violation of the then existing federal statute which required that the arresting federal officer "take the defend-

ant before the nearest United States commissioner."

*Anderson*, on the other hand, involved the admissibility of evidence obtained by federal officers during a period of time in which the defendants were illegally detained under a working arrangement with state officers. The Court held that "the considerations which led to [the] decision [in *McNabb*] also govern this case." It was accordingly concluded that under the facts there involved "there was a working arrangement between the federal officers and the sheriff of Polk County" and that "the fact that the federal officers themselves were not formally guilty of illegal conduct does not affect the admissibility of the evidence which they secured improperly through collaboration with state officers" [Id., at 356, 63 S.Ct. at 602].

*McNabb* and *Anderson*, on their respective facts, involved the admissibility of statements taken from defendants during a period of illegal detention. The controversy set off by the *McNabb* decision related primarily to statements rather than physical or other evidence. That controversy antedated the adoption of the Rules of Criminal Procedure but it became entwined with the procedures under which the Rules were promulgated.

The Advisory Committee proposed that the rule of *McNabb* be codified as Rule 5(b). Proposed Rule 5(b) was actually written into the Preliminary Draft. It, however, was entirely omitted from the Final Draft. It was never included in any form in the Rules as adopted. The rule of *McNabb*, like the earlier rules of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) and of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), is followed today as a rule of decision rather than as a formally promulgated Rule of Procedure.

It is not necessary that we trace in detail all of the cases between *McNabb* and the Court's decision in Mallory v.

United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), other than to observe how compliance with Rule 5 (a) is to be enforced.

United States v. Mitchell, 322 U.S. 65, 71, 64 S.Ct. 896, 898, 88 L.Ed. 1140 (1944), a pre-Rule 5(a) case, made clear that the establishment of the new exclusionary rule was "not to be used as an indirect mode of disciplining misconduct." The Court held, on the facts, that the evidence actually admitted in *Mitchell* was not part of the "fruits of wrongdoing by [government] officers." [Id., at 70, 64 S.Ct. at 898].

Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948), however, made clear that while the *McNabb* rule was not based on constitutional grounds, the requirements of the then newly promulgated Rule 5(a) would be enforced as strictly as had been the former Congressional mandate. *Upshaw* also teaches that *Mitchell* is distinguishable from *McNabb* on its facts. Mallory v. United States made clear that Rule 5(a) "is part of the procedure devised by Congress for safeguarding individual rights without hampering effective and intelligent law enforcement" [354 U.S. at 453, 77 S.Ct at 1359], and that the rule is to be enforced as written.

Professor Wright, in § 75 of Federal Practice and Procedure accurately states that:

> Most of the cases involving the *McNabb-Mallory* rule have concerned the admissibility of confessions and other inculpatory statements obtained during a period of unnecessary delay. This is not, however, the full reach of the rule. It was formulated by the Supreme Court to deter violations of Rule 5(a), and in order that it may have that purpose, it requires the exclusion of "all evidence obtained by federal agents through access to persons while detained in violation of Rule 5(a)."[8] This includes fingerprints taken during a period of un-

---

8. The quotation in the above quotation from Wright is from U. S. v. Klapholz, C.A.2d, 1956, 230 F.2d 494, 498, certi-orari denied 351 U.S. 924, 76 S.Ct. 781, 100 L.Ed. 1454, which is appropriately cited in a footnote.

necessary delay, tangible evidence obtained from the arrested person by reason of his arrest, and observation by an officer of reenactment of the crime by the accused.

In 1956, in the relatively unnoticed case of Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 223 (1956), the Supreme Court applied the rationale of *McNabb* to insure compliance with the Rules of Criminal Procedure.

The Court held that a District Court should *go so far as to issue an injunction* against a federal agent who may have violated Rule 41(c) because such action would be "merely to enforce the federal Rules against those owing obedience to them" [Id., at 217, 76 S.Ct. at 294]. The Court stated:

> The obligation of the federal agent is to obey the Rules. They are drawn for innocent and guilty alike. They prescribe standards for law enforcement. They are designed to protect the privacy of the citizen, unless the strict standards set for searches and seizures are satisfied. That policy is defeated if the federal agent can flout them and use the fruits of his unlawful act either in federal or state proceedings. [Id., at 217–218, 76 S.Ct. at 295].

Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), removed any doubt that the fruits of a federal agent's unlawful action included both physical and verbal evidence. That case pointed out that the "policies underlying the exclusionary rule [does not] invite any logical distinction between physical and verbal evidence." [Id., at 486, 83 S.Ct. at 416]. United States v. Klapholz, 230 F.2d 494 (2d Cir., 1956), cert. denied 351 U.S. 924, 76 S.Ct. 781, 100 L.Ed. 1454 (1956), rejected the precise argument made by the Government in this case. The Government argued in that case, as they do in this, that the exclusionary rule was limited to the suppression of confessions, rather than the suppression of *all* evidence obtained after the violation of Rule 5(a). It was held, however, that:

> Since the rule was one formulated by the Supreme Court as a deterrent to detentions in violation of Rule 5(a), we think that it extends to *all evidence* obtained by federal agents through access to persons while detained in violation of Rule 5(a). [Emphasis the court's]. [Id., at 498].

Bynum v. United States, (1958) 104 U.S.App.D.C. 368, 262 F.2d 465, involved the question of whether physical evidence in the form of finger prints taken during illegal detention were admissible in a robbery case. Again, the Government argued, as it does in this case, that the exclusionary rule was applicable only to confessions rather than to other types of evidence acquired during an illegal detention in violation of Rule 5(a). The Court of Appeals determined that appropriate judicial enforcement of Rule 5(a) requires a "forthright and comprehensive rule that illegal detention shall yield the prosecution no evidentiary advantage in building a case against the accused." That court further stated:

> True, fingerprints can be distinguished from statements given during detention. They can also be distinguished from articles taken from a prisoner's possession. Both similarities and differences of each type of evidence to and from the others are apparent. But all three have the decisive common characteristic of being something of evidentiary value which the public authorities have caused an arrested person to yield to them during illegal detention. If one such product of illegal detention is proscribed, by the same token all should be proscribed. [Id., at 467].

See also Adams v. United States, (1968) 130 U.S.App.D.C. 203, 399 F.2d 574, in which testimony of a police station identification made during a period of illegal detention in violation of Rule 5(a) was held inadmissible. Circuit Judge, now Chief Justice, Burger wrote a concurring opinion in *Adams* which he opened with the statement: "I concur

without reservation in the result reached by the court in this case." Chief Justice Burger, we think correctly, pointed out in his concurring opinion that the Supreme Court's decision in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), made any reliance upon *Mallory* unnecessary.[9]

Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), removes any possible question concerning the applicability of the exclusionary rule to physical evidence which must be said to be the product of an unlawful detention. The Court explicitly agreed with and adopted the conclusion of the Court of Appeals for the District of Columbia in *Bynum* when it quoted exactly the same language of that case which we have quoted above.

■ The Government's argument that violations of Rule 5(a) are to go unnoticed except in regard to statements taken from a defendant illegally detained is untenable for the reasons stated. The exclusionary rule must and will be applied to *all* evidence obtained, including but not limited to the gun involved in this case.

## VII.

In Culombe v. Connecticut, 367 U.S. 568, 584, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), Mr. Justice Frankfurter directed attention to state statutes which require "the prompt taking of persons arrested before a judicial officer." [Ibid, 584, 81 S.Ct.]. Section 544.170, Missouri's twenty hour statute, was cited in footnote 26 on page 584 of 367 U.S., page 1869 of 81 S.Ct., as one of the many examples. But, as the numerous cases in the Notes of Decisions in Vernon's Annotated Missouri Statutes under Section 544.170 establish, the courts of Missouri do not attempt to enforce that statute or

Missouri Rules 21.14 and 37.17 by the utilization of an exclusionary rule of evidence based on the rationale of the *McNabb-Mallory* rule. Nor is any other effective effort made to enforce those state procedural requirements.

The procedural requirements of Missouri law and the procedural requirements of Rule 5(a) are essentially the same. We think Professor Wright was quite close to the mark when he stated in § 72 of Federal Practice and Procedure that "the difference is that the state provisions are unenforcible, and largely ignored, while the Supreme Court has developed powerful sanctions against any violation of Rule 5(a)."

■ We have determined as a matter of fact that Rule 5(a) was violated in this case in that the working arrangement between state and federal law enforcement officers permitted the defendant to be unlawfully detained and, as a result, the defendant was not taken before the United States Commissioner without "unnecessary delay" in regard to the federal charge involved in this case.

It is particularly distressing that considerations of judicial integrity force us to acquit in this case because it presents a situation in which, in a proper and commendable spirit of cooperation, the state law enforcement officers reasonably relied upon federal officers to promptly assume lawful custody of the defendant.

It is obvious that the federal officers involved in this case were under the impression that under the circumstances there was no need for them to comply with Rule 5(a). That erroneous conclusion was apparently based on the notion that the form, rather than the substance, of defendant's custody would be recog-

---

9. We also agree with Professor Wright's observation that the controversy over the *McNabb-Mallory* rule as applicable to confessions "will now be quieted by the decision of the Supreme Court in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)."

See § 72 of Wright on Federal Practice and Procedure. It is apparent therefore that evidence obtained in violation of Rule 5(a) in future cases will more likely involve physical evidence rather than line-up identifications or statements obtained during illegal detention.

nized, should any violation of Rule 5(a) be called to judicial attention.

The controlling Supreme Court cases and the rationale upon which those cases are based require that the Rules of Criminal Procedure be fairly applied and judicially enforced. Those cases require that when it is established that the Rules have been violated, appropriate sanctions must be applied, else observation of the Rules is left to the discretion of those whose conduct they are designed to regulate.

Accordingly, defendant's objection to the admission in evidence of the gun must be sustained on the ground that Rule 5(a) was violated. Without that essential piece of evidence, the Government's case fails. We have therefore this day filed a verdict of not guilty.