**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Manuel Mendoza TORRES, Max Candido Griego, Sarah Godoy and Susan Smith Spiegel, Defendants-Appellants.**

Nos. 81–1102 to 81–1105.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Sept. 30, 1981.

Decided Nov. 5, 1981.

Rehearings Denied Dec. 4 and
Dec. 28, 1981.

Wayne G. Chew, Asst. U. S. Atty., Albuquerque, N. M. (R. E. Thompson, U. S. Atty., Albuquerque, N. M., with him on the brief), for plaintiff-appellee.

Vince D'Angelo, D'Angelo, McCarty & Vigil, Albuquerque, N. M., for defendants-appellants.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The above named defendants-appellants seek reversal of convictions based on charges having to do with conspiring to rob a federally insured national bank with the use of dangerous weapons contrary to 18 U.S.C. § 371 and 18 U.S.C. § 2113(a), (d). Also charged in the indictment against all four defendants was the substantive crime of actual robbery of the bank, together with aiding and abetting that crime under 18 U.S.C. § 2. In addition, Sarah Sotello Godoy and Max Candido Griego were charged with possession of a firearm by a former felon in violation of 18 U.S.C.App. § 1202(a). A jury trial was had and all defendants were found guilty on all counts, except that Griego was found innocent of the possession charge.

The incident occurred on September 26, 1980. The Las Vegas police received a re-

port that a brown pick-up truck may have been involved. This truck was readily found abandoned located in a place close to the bank. A public service employee notified the police that a gold-colored Firebird with Arizona license plates containing several individuals had departed the area where the brown truck had been found. The police obtained a description of the robbers from victims at the bank. This included their approximate height, body type, race, sex and clothing, together with a description of the guns which had been carried. A further connecting link was the mentioned gold Firebird with Arizona license plates. It was seen by the police at a service station in Las Vegas. The four defendants were found at the station in the car and in a van which was parked beside it. The defendants were questioned by the police, and defendant Torres gave the police consent to search the Firebird. A small caliber weapon was found in the door pouch; weapons were found on the persons of both Torres and Griego, and were confiscated. The defendants and the weapons which were found conformed to the description that the police had obtained. All of the defendants were arrested. They were taken to the Las Vegas police station for processing. The F.B.I. was immediately notified of the robbery of the bank and of the apprehension of the defendants. On that day both the local police and the F.B.I. questioned the defendants. This was carried out approximately two hours after the capture. The defendants were given *Miranda* warnings and they signed waiver forms. They did not request counsel. But the statements made were not inculpatory. These were denials and were an avoidance.

The police sought a search warrant for the impounded Firebird but the district attorney directed the police to first try to obtain the defendants' consent to the search of the car. Defendant Torres, the apparent owner of the Firebird, signed a consent permitting the police to make a "complete" search, and authorized the taking of "letters, papers, narcotic drugs, other drugs, material or other property." This all occurred on the very first day, that is, September 26th, including the original search, which was not a thorough one. In connection with that, the Las Vegas police found a wallet that had been identified by one of the *victims* of the robbery. Torres was confronted by an F.B.I. agent with this wallet. He told the F.B.I. man that he did not mind the police looking through his car, but he had not intended it to be torn apart. This statement apparently was not relayed to the Las Vegas police.

Subsequently, the police did a further search of the Firebird, and in pulling out an ashtray in the side of the door, they were able to see some money in the well of the ashtray. They then removed the air-vent cover in the side of the door, because the vent was connected to the ashtray well. There they found a bag of money which contained marked bills, later identified as having come from the First National Bank.

On September 30, following consultation with the local district attorney, the United States decided to prosecute the defendants on federal bank robbery charges. No state charges of armed robbery were ever filed by New Mexico. The following day, October 1, the United States filed the charges, and on the 2nd the defendants were arraigned for the first time before a United States Magistrate, in Albuquerque, New Mexico.

\*    \*    \*

The four points or contentions advanced on behalf of the appellants are:

1. That defendants were unlawfully arrested at the Las Vegas service station, because the police lacked probable cause to make the arrests.

2. That the defendants were not brought before a magistrate for six days from the time of the arrest, and therefore, there was unnecessary delay, violative of the Federal Rules of Criminal Procedure 5(a).

3. That the money found in the Firebird was obtained unlawfully, because defendant Torres had retracted his consent to the search of the vehicle.

4. That the prosecution did not adequately prove that Sarah Godoy was a convicted felon whereby she could be convicted of possession of a firearm under 18 U.S.C. App. § 1202(a).

### I.

*Were the defendants unlawfully arrested at the Las Vegas service station very soon after commission of the offense, whereby there was a lack of probable cause?*

Our examination of the facts convinces us that there was adequate evidence to constitute probable cause justifying the arrest. The officers received information concerning the robbery at once. Much of this came in radio communications. They had the descriptions of the robbers, the guns used, information regarding the brown pick-up truck and the gold Firebird with Arizona license plates. Also relayed over the radio was information that the bank had been robbed by a tall, slim male who was wearing a trench coat, a short, stocky male, and a woman (Godoy), all of Spanish descent, together with an Anglo woman (Spiegel). There were descriptions of two guns, one silver and one dark, square-barrelled revolver. The police were notified, also, that a gold Trans-Am Firebird was seen at Ollie's Lounge. After hearing this on the radio, Captain Tapia, of the Las Vegas Police Department, drove toward Ollie's Lounge, and saw a gold-colored Pontiac, with Arizona license plates at a service station. The driver was a tall, Spanish male, wearing a trench coat. He was outside the car, talking to a shorter, Spanish male, whose appearance coincided with the description which the police had been given. He was driving a tan van. Defendant Torres was the driver of the Pontiac; Defendant Griego was the driver of the tan van; the two women passengers of the Pontiac were defendants Godoy and Spiegel. Tapia detained all four defendants for approximately twenty minutes, until other police authorities arrived. Following the stop, the police sought and received permission from Torres to search the gold Pontiac. In the door pouch of the car, the police found a

small, twenty-two caliber weapon; also found in the car later was a black leather wallet. The large square-barrelled revolver was discovered on Torres. The defendants were then placed under arrest. It was after the arrest that a silver automatic handgun was found on the person of defendant Griego, and another weapon, a forty-five caliber handgun, was discovered on the person of Torres. After that the defendants were taken to the police station and following warnings and waivers, they were questioned. It is very clear that this was a hot pursuit situation, although the defendants may have thought that they would mislead the police by not racing out of town and being on the scene. However, the circumstances discovered coincided in every detail with the facts reported, so that the conclusion was very apparent.

█ There was a right in the first instance to conduct a preliminary Terry-type investigation. Having done that, the facts which were learned from this constituted ample evidence showing probable cause, justifying arrest. We must reject the argument regarding invalidity or insufficiency of evidence to justify the arrest.

It is noteworthy that three days after the original arrest, the police learned that the gold Pontiac was a stolen car. Also to be noted is that $87,700 in cash which was identified as money taken in the robbery was found behind a panel in the back of the car. Finally, it should be pointed out that evidence sufficient to establish guilt beyond reasonable doubt is not necessary in order to justify the action which was taken by the officers. The arresting officers were able to rely on information supplied by fellow officers through radio communications. When the actual facts coincided with the original information, probable cause existed. *Holt v. United States*, 404 F.2d 914, 918 (10th Cir. 1968), *cert. denied*, 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779 (1969). The officers at this point of the arrest had reasonably trustworthy information adequate to support their belief that the law had been violated. *Brinegar v. United States*, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–

1311, 93 L.Ed. 1879 (1949); *United States v. Matthews*, 615 F.2d 1279 (10th Cir. 1980); *United States v. James*, 496 F.Supp. 284 (W.D.Okla.1977).

■ Following the initial stop for questioning, the handguns were found on Torres and Griego. This fact, together with the descriptive information obtained shows that probable cause did exist at the moment of arrest as required under the provisions of the Fourth Amendment. See *United States v. Smaldone*, 485 F.2d 1333, 1350 (10th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974). Inasmuch as probable cause existed the warrantless arrest was proper under the Fourth Amendment. *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). It was said, in *Beck* at p. 91, 85 S.Ct. at 225, that the rule of probable cause is a practical non-technical conception; that requiring more would unduly hamper law enforcement.

In a relatively recent decision, *Colorado v. Bannister*, 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980), an officer saw occupants of a vehicle and other corroborating evidence which matched the description from a crime scene in a police radio dispatch. The Court said that there was probable cause to arrest under those circumstances.

## II.

*Was the delay in bringing the defendants before a magistrate a violation of the McNabb-Mallory doctrine which renders the evidence illegal and hence inadmissible?*

■ The defendants rely on *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). These cases hold that federal courts in their supervisory power over the administration of justice in the federal arena must exclude confessions obtained during a period of undue delay in bringing the defendants before a magistrate. The rationale for this ruling is found in preventing the police from obtaining confessions during the period of delay so as to avoid the giving of notice to the accused that he has certain rights, including the right to counsel, and the right to remain silent. It can be said that it is for the purpose of protecting the accused against the illegal obtaining of evidence. The *McNabb-Mallory* rule has been codified in Rule 5(a) of the Federal Rules of Criminal Procedure, which reads as follows:

Rule 5. Initial Appearance Before the Magistrate.

(a) In General. An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate or, in the event that a federal magistrate is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041. If a person arrested without a warrant is brought before a magistrate, a complaint shall be filed forthwith which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause. When a person, arrested with or without a warrant or given a summons, appears initially before the magistrate, the magistrate shall proceed in accordance with the applicable subdivisions of this rule.

The essence of the rule is to prevent invalidly obtained confessions and perhaps other evidence prior to allowing the accused to have access to the court. Whether there was original probable cause and whether the time period was reasonable is to be determined in light of all the facts and circumstances of the case. See *Walton v. United States*, 334 F.2d 343, 346 (10th Cir. 1964), *cert. denied*, 379 U.S. 991, 85 S.Ct. 706, 13 L.Ed.2d 612 (1965); *See* Advisory Committee Note to Fed.Crim.P.R. 5(a);

Rule 5(a) becomes applicable once the accused is taken into federal custody. *Hayes v. United States*, 419 F.2d 1364 (10th Cir. 1969); *cert. denied*, 398 U.S. 941, 90 S.Ct. 1856, 26 L.Ed.2d 276 (1970); *Daro v. United States*, 380 F.2d 23 (10th Cir. 1967). In this case it was not until September 30th that the United States determined that it would

prosecute; on October 1st the federal charges were filed, and the next day the defendants were taken before the magistrate. They contend that the period of custody to be considered started on September 26th, the date that the Las Vegas police arrested the defendants, because, they say, there was "a working agreement between the F.B.I. and the local police." This arrangement, appellants contend, should make all state custody into federal custody for the purposes of Rule 5(a).

Knowing the practicalities of this kind of situation, including the fact that various clearances and determinations have to be made, it is not possible to presume, as the defendants would have it, that the delay was pursuant to a working arrangement or that it was not otherwise carried out in good faith. There is no evidence to support the suggestions of defendants.

An example of a so-called "working arrangement" is found in the Supreme Court's decision in *Anderson v. United States*, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1942). In that case, the original arrests were made by state officials and the defendants were kept in the sheriff's facility for six days. The F.B.I. did all the questioning; and when the defendants confessed on the sixth day, the F.B.I. arrested them and had them brought before a magistrate. The crime was peculiarly federal from the start; it involved the destruction of the Tennessee Valley Authority property, and it was clear that the state was only interested in helping the F.B.I. make a federal arrest. The Court found that a working arrangement existed between federal and state officials during these six days of confinement. It was held that though the "federal officers themselves were not formally guilty of illegal conduct [this] does not affect the admissibility of the evidence which they secured improperly through collaboration with state officers." 318 U.S. at 356, 63 S.Ct. at 602.

Examination of the cases shows that there are few instances in which a working arrangement has been found to exist. In the case of *United States v. Broadhead*, 413 F.2d 1351 (7th Cir. 1969), *cert. denied*, 396 U.S. 1017, 90 S.Ct. 581, 24 L.Ed.2d 508 (1970), the Court found a working arrangement where, at the behest of the F.B.I., the police set up a roadblock and arrested the defendant. The city jail was used by the F.B.I. as a temporary detention site, and a line-up was conducted to identify the defendant. *Cf. United States v. Nygard*, 324 F.Supp. 863 (W.D.Mo.1971).

In the case at bar, it was incumbent upon the appellants to show that state custody was used in order to circumvent Rule 5(a), *supra*. *United States v. Rose*, 415 F.2d 742 (6th Cir.), *cert. denied*, 396 U.S. 971, 90 S.Ct. 458, 24 L.Ed.2d 438 (1969); *Barnett v. United States*, 384 F.2d 848 (5th Cir. 1967). More than a "bare suspicion" of a working arrangement is required to show constructive federal custody as having occurred at the moment of state arrest. *United States v. Gaines*, 555 F.2d 618 (7th Cir. 1977); *Butterwood v. United States*, 365 F.2d 380 (10th Cir. 1966), *cert. denied*, 386 U.S. 937, 87 S.Ct. 960, 17 L.Ed.2d 810 (1967); *Young v. United States*, 344 F.2d 1006, 1010 (8th Cir.), *cert. denied*, 382 U.S. 867, 86 S.Ct. 138, 15 L.Ed.2d 105 (1965).

The defendants at bar have not shown through competent evidence that a collusive working agreement was utilized in order to illegally postpone the appearance before the magistrate. The Las Vegas police took charge of the investigation at the outset. The bulk of the evidence was obtained the very first day. It was substantial and probably adequate to submit the case to a jury. The Las Vegas police initially investigated the bank's call for help after the robbery. They made the arrest and transported the appellants. Due to concurrent jurisdiction in the relationship with a national bank, the F.B.I. was notified about the apprehension of these individuals. There was apparently some evidence given at the suppression hearing and at the trial indicating that there was some confusion as to which authority would take charge. However, there was neither testimony from the F.B.I. nor from the Las Vegas police that the F.B.I. was in charge. There was testimony that

the state was proceeding on the possibility that the state charges of armed robbery might be filed, even though federal charges were also filed. Lt. Sena of the police did say that he felt that he should take orders from the F.B.I. and that jurisdiction lay in their hands. This, however, was a subjective viewpoint. It is not unusual, nor is it suspicious or irregular, for both state and federal officials to investigate the same suspect, and to cooperate in the solution of the crime. This does not make one the agent of the other. See *Butterwood, supra,* at 385. State charges were not filed against these appellants, but this is of no significance. The important point is that evidence is lacking which shows that the delay was part of an effort to avoid taking the defendants before the magistrate. There was no effort following the first statements that were made to persuade them to make confessions. So, therefore, we fail to see a diabolic motive. Thus, the surrounding facts refute the contention.

The working relationship contention has not been successful in most instances. It has been unsuccessful in most instances, and the facts in this case are not unlike the facts in other cases which have been decided. See *United States v. Lepinski,* 460 F.2d 234 (10th Cir. 1972); *United States v. Fallon,* 457 F.2d 15 (10th Cir. 1972); *Hayes v. United States,* 419 F.2d 1364 (10th Cir. 1969), *cert. denied,* 398 U.S. 941, 90 S.Ct. 1856, 26 L.Ed.2d 276 (1970); *United States v. Rose,* 415 F.2d 742 (6th Cir.), *cert. denied,* 396 U.S. 971, 90 S.Ct. 458, 24 L.Ed.2d 438 (1969); *Butterwood v. United States,* 365 F.2d 380 (10th Cir. 1966), *cert. denied,* 386 U.S. 937, 87 S.Ct. 960, 17 L.Ed.2d 810 (1967); *United States v. Coppola,* 281 F.2d 340 (2nd Cir. 1960) (en banc), *affirmed per curiam,* 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961).

Quite apart from the question as to whether there was unlawful collaboration between the state and the federal government, we note also an alternative ground for upholding the action that was taken.

This is the lack of causation between any delay and the evidence obtained. The statements, the fingerprints, the consent to search and the physical evidence were not the fruits of any illegal activity on the part of the police or the F.B.I. *United States v. Mitchell,* 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944). One requirement of the *McNabb-Mallory* supervisory rule is that the delay must contribute to or induce the allegedly tainted evidence. *See United States v. Montes-Zarate,* 552 F.2d 1330 (9th Cir. 1977), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978); *United States v. Fallon,* 457 F.2d 15 (10th Cir. 1972); *Chapman v. United States,* 397 F.2d 24 (10th Cir. 1968).

The statements that were taken from the defendants were obtained when they were first brought to the Las Vegas police station (these were not inculpatory in nature). Fingerprints and other physical evidence were obtained on the same day, and the written consent for the search of the gold Firebird was also obtained shortly after their arrival at the police station. The finding of the wallet pursuant to the initial search occurred on the 26th, as well. So, there was no delay in obtaining any of this evidence, except for the money. The search for the money related back to the consent given on the first day. Thus, there is little that can be said by the defendants as to the injury or prejudice suffered as a result of the failure to take them before the magistrate immediately.[1] The testimony of the police demonstrates that the money was recovered from the Firebird on the 29th of September, and that this evidence was obtained pursuant to the consent that was given on the 26th. It is possible that the defendant did not expect that the search would produce the money, but we cannot agree with the defendants that the consent to search thoroughly was revoked when one of the defendants was confronted with the billfold of a victim and the statement made that consent had not been given to tear the car apart. This expresses dissatisfaction

---

1. However, this delay surely should not be practiced by the F.B.I. or the police, because it could, in different circumstances, cause the evidence to be excluded.

with the way the search was being conducted, or the efficiency and depth of it, but it does not constitute a revocation of the consent.

It is further argued that the money should have been suppressed as evidence because it was not found in the car until the 29th of September. This was the result of a voluntary consent given on the 26th of September, immediately after the arrest. Thus, it was attenuated from any illegality. Cf. *Smith v. United States*, 324 F.2d 879 (D.C.Cir. 1963); *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964).

The authorities dealing with this general subject are usually concerned with confessions. Indeed, in *Mallory*, Justice Frankfurter's concern was to prevent the police from spiriting away a defendant and then giving him the "third degree" until he confesses. 354 U.S. at 453–454, 77 S.Ct. at 1358–59. There are, however, some decisions which give the doctrine a broader effect—applicable to all evidence. See *Watson v. United States*, 249 F.2d 106 (D.C. Cir.1957); *United States v. Klapholz*, 230 F.2d 494, 498 (2nd Cir.), *cert. denied*, 351 U.S. 924, 76 S.Ct. 781, 100 L.Ed. 1454 (1956).

The *Watson* case holds that it is governed by *Mallory* because the facts are similar to that case. Watson had been apprehended at 6:40 p. m., upon returning to his home from his place of employment. Thereafter, he was not that day arraigned. During the evening and part of the night he was questioned and he denied all guilt until about 3:15 a. m., when he made the first oral, inculpatory disclosures. They were repeated to various officers the next morning before 9:00 a. m., when the courts in the district were opened. Many judges were available, but Watson was not presented to them. After 9:00 in the morning, still without arraignment and lacking judicial warning, he reenacted the crime, and went to his apartment, where the police obtained the articles of clothing which were offered in evidence against him. The police spent an entire day searching the apartment. It was only some hours after this that he was arraigned. And so it was held that his

admissions, his reenactment of the crime and his consent to the visit to his apartment, and his turning over the clothing were all inculpatory admissions. His reenactment of the crime, his consent to the visit to his apartment and his turning over the clothing were all under warrant, and the evidence had been so developed during the period following by many hours his arrest the previous evening. The Second Circuit held that he was not arraigned until all the evidence had been obtained; the conviction was reversed. The case is plainly distinguishable from this one. Considered from a factual comparison the arrest here was made almost immediately after the crime was committed, and most of the evidence was obtained on that occasion and at that time.

The situation is somewhat similar in *United States v. Klapholz. Klapholz* turned on whether the evidence other than the confession was to be suppressed under the *McNabb* rule. Judge Weinfeld had ruled that all evidence derived as a result of the government agents going to the defendant's apartment was to be suppressed. The Circuit stated that Judge Weinfeld was right in refusing to suppress evidence obtained prior to that date and hour. There is no information to the contrary in the former opinion. But as to evidence obtained in defendant's home *after* that time, it was held that the suppression of all such evidence was appropriate, since the *McNabb* rule was not limited to the suppression of confessions.

### III.

### *Was the consent to search the Firebird valid?*

■ The waiver was obtained immediately after arrest. It is true that the person who claimed to be the owner of the car later said that the waiver was no longer in force, simply because, as he told the F.B.I. officer, who did not communicate it further, he did not expect the officers to tear the car apart when he consented to having it searched. But he did agree to a thorough search, and as it was said above, we do not

regard this statement made to the F.B.I. agent as a statement which voided the consent which had previously been given. Unquestionably Torres gave his voluntary consent when he signed the form which was provided him. This explained that a complete search was to be made, and thus, of course, it logically follows permission to search contemplates a thorough search. If not thorough it is of little value. *See United States v. Milhollan*, 599 F.2d 518, 527 (3rd Cir. 1979), *cert. denied*, 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1980). A complete search was authorized, and it should have been anticipated that it would be a careful one, although the defendant may have thought that the officers might overlook that money. We are not saying that a waiver under the Fourth Amendment may not be withdrawn. The question as to whether it was is, though, a factual one for the trial court and it should not be over-turned unless there exists a good reason and basis. *United States v. Bracer*, 342 F.2d 522 (2nd Cir.), *cert. denied*, 382 U.S. 954, 86 S.Ct. 427, 15 L.Ed.2d 359 (1965). The consent must be judged, in terms of the limitations upon it, by the clearly erroneous standard of review. *Villano v. United States*, 310 F.2d 680, 684 (10th Cir. 1962). After full consideration it is our determination that the search that turned up the bank's money was reasonable and within the bounds of the actual consent given. *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir. 1971); *Honig v. United States*, 208 F.2d 916, 919 (8th Cir. 1953). As we said above, we remain unconvinced that there was any revocation of the authority given to search the vehicle.

## IV.

*Was the evidence insufficient to identify the appellant Godoy?*

██ Godoy maintains that her conviction as a former felon for possession of a firearm, pursuant to 18 U.S.C. § 1202(a)(1) ought to be reversed. She asserts that the government did not meet its burden in proving that she is a convicted felon. The elements of this offense are the (1) knowing and willing (2) possession of a firearm, (3) by a previously convicted felon. *United States v. Cable*, 446 F.2d 1007 (8th Cir. 1971). It is this question of her being a felon that is challenged.

The record discloses that an Arizona fingerprint card and an Arizona certificate of conviction and sentence on a voluntary manslaughter charge was introduced as evidence in this case. She was convicted in February of 1976 of this crime. Fingerprints were taken of the appellant and were introduced into evidence here. The parties stipulated that the prints taken in Arizona on a bank robbery charge belonged to the defendant Sarah Sotello Godoy. Thus, it was a question for the jury to decide whether appellant Godoy was beyond reasonable doubt convicted of a felony. They so found. The evidence as to her identity "must be viewed in the light most favorable to the government to determine whether there is sufficient, substantial proof, direct and circumstantial, together with inferences reasonably to be drawn, on which the defendant might be found guilty beyond a reasonable doubt." *United States v. Swallow*, 511 F.2d 514 (10th Cir. 1975); *cert. denied*, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66. The Arizona documents provide the same three names, the same social security number and birthdate, and a similar physical description as that of the appellant in this case. Moreover, it is about the only way that proof can be made, through fingerprints and photographs at the institution. That approach was taken here, and we hold that it was adequate.

The judgment and convictions as to all four defendants are affirmed.