UNITED STATES of America, Plaintiff–Appellee,

v.

Carmen Maria MAESTAS, Defendant–Appellant.

No. 92–2220.

United States Court of Appeals, Tenth Circuit.

Aug. 6, 1993.

---

R. Morgan Lyman, Asst. Federal Public Defender, Las Cruces, NM, for defendant/appellant.

Charles L. Barth, Asst. U.S. Atty., and Don J. Svet, U.S. Atty., Las Cruces, NM, for plaintiff/appellee.

Before SEYMOUR, ANDERSON, and EBEL, Circuit Judges.*

* After examining the briefs and appellate record, this panel has determined unanimously that oral

EBEL, Circuit Judge.

The defendant-appellant, Carmen Maestas, appeals the district court's denial of her motion to suppress evidence of marijuana found in her car at a fixed Border Patrol checkpoint in New Mexico as well as certain incriminating statements she made while at the checkpoint. She contends that she was subject to a pretextual seizure when she passed through the checkpoint and that this evidence was therefore excludable as the tainted "fruit" of an illegal seizure. We hold that Maestas was not illegally seized and therefore affirm the denial of her motion to suppress.

## I. FACTS

On December 17, 1991, Bernie Velasquez, a roving Border Patrol agent, observed Carmen Maestas sitting in a pink Buick parked on the north side of Interstate 25 near mile marker 11 in New Mexico. Agent Velasquez and his partner, Agent Woodside, traveled north for about seven miles before seeing a dark-colored GMC pickup truck backing up in the southbound lane against traffic. About fifteen to twenty minutes later, the agents turned and went south on the interstate, and saw the truck and the Buick traveling near one another going north on the interstate. Agent Velasquez testified that they suspected that the two vehicles were traveling together to "scout" the Border Patrol checkpoints—that is, to see if they were open and whether a dog was working.

Upon spotting the vehicles together, the agents turned and followed them. After following them for a few miles, the agents observed the Buick pass the truck and speed up until it was out of sight. The truck did not follow or chase the Buick. The roving patrol agents radioed agents at a fixed Border Patrol checkstation in Truth or Consequences, New Mexico, about what they had observed.

Another roving patrol officer, Agent Garcia, subsequently informed Agents Velasquez and Woodside that he had seen the Buick take the Williamsburg, New Mexico exit.

While parked across the street from a store just off the Williamsburg exit, Agent Garcia saw another car, a Pontiac, at the store with the Buick, and later saw the dark pickup truck pull into the same parking lot. Agent Garcia observed Maestas, who was driving the Buick, speak with the passenger of the truck as she was leaving the store, although he admitted that he did not know what either said. Agent Garcia then drove to the fixed checkpoint at Truth or Consequences. Because Agents Velasquez and Woodside were suspicious of the three vehicles, they too drove to the fixed checkpoint and waited there until Maestas appeared.

Agent Michael Maroney was working in the primary inspection area at the fixed checkpoint on the day Maestas passed through. When Maestas arrived at the primary inspection area, Agent Maroney asked Maestas about her citizenship. After she responded that she was a United States citizen, Agent Maroney asked her where she was coming from and whether she was traveling with any other vehicles. She stated that she was coming from Dona Ana, New Mexico, and that she was not traveling with anyone. Agent Maroney felt that Maestas was being evasive, given that she stated she was traveling alone, would not make eye contact with him, repeated his questions before answering them, and acted nervous. Agent Maroney asked whether she owned the car, and Maestas answered that it was her husband's. However, the car registration Maestas produced showed the owner to be Manuel Serna, who had a different surname and address than those shown on Maestas' New Mexico driver's license. Agent Maroney testified that after observing Maestas' behavior, he asked her if she would consent to a search of her vehicle. She responded "okay," and he asked her to pull over to the secondary checkpoint. Maestas was in the primary inspection area for at most two minutes.

Agent Maroney then waited while Agent Velasquez stopped and questioned the next car, the Pontiac that was reportedly traveling with Maestas. He overheard Agent Velas-

---

argument would not materially assist the determination of this appeal. *See* Fed.R.App.P. 34(a);

10th Cir.R. 34.1.9. Therefore, the case is ordered submitted without oral argument.

quez question the car's occupants about their citizenship and whether they were traveling with the Buick. The occupants stated that they were United States citizens traveling with the woman in front of them. Agent Maroney then proceeded to the secondary inspection area, where he again asked for and received permission from Maestas to search the pink Buick.

Upon request, Maestas opened the trunk of the car, and Agent Maroney looked into it. He then asked if Maestas would consent to a canine inspection of her car. She consented. The dog alerted to the trunk of the Buick driven by Maestas, although it did not alert to the Pontiac or the pickup truck. Maestas was in the secondary inspection area for at most five minutes before the dog alerted to the Buick. About one pound of marijuana was found in a suitcase inside a brown cardboard box in the Buick's trunk. After being advised of her rights, Maestas stated that the marijuana was hers.

On December 18, 1991, Maestas was charged by information with possession of marijuana in violation of 21 U.S.C. § 844(a). On January 31, 1992, she filed a motion to suppress the marijuana and her confession on the ground that the stop was unreasonable under the Fourth Amendment because (1) the roving Border Patrol agents used the fixed checkpoint as a pretext to make a roving patrol stop for which they did not have the requisite reasonable suspicion, and (2) the stop abused the fixed checkpoint by giving the roving agents unbridled discretion. After a hearing, the magistrate judge denied the motion to suppress on April 15, 1992.

On May 26, 1992, Maestas pleaded guilty under an agreement allowing her to appeal the denial of the suppression motion. The district court affirmed the magistrate judge's denial of the suppression motion on October 5, 1992. Maestas appeals, contending that the district court erred in denying the suppression motion. She contends that both her initial stop at the fixed border checkpoint and her referral to the secondary checkpoint were pretextual and therefore unreasonable under the Fourth Amendment. That is, Maestas asserts that the roving Border Patrol agents used the fixed checkpoint to stop her to investigate her suspicious behavior that suggested she might be smuggling drugs—something that she asserts they could not have otherwise done because they did not have the quantum of suspicion for a roving patrol stop required by *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). She therefore asserts that the fruits of these unreasonable seizures—including the marijuana and her confession—should be suppressed under *Wong Sun v. United States*, 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–18, 9 L.Ed.2d 441 (1963), and *United States v. Recalde*, 761 F.2d 1448, 1459 (10th Cir.1985). Because we find no illegality in either the initial stop of Maestas or in her reference to the secondary checkpoint, we find that the district court properly denied her motion to suppress.

We will first address whether there could ever be a pretextual stop at a border checkpoint, which requires no individualized suspicion to justify an initial stop. We will then assess the legality of the decision to stop Maestas at the primary inspection area of the checkpoint. Finally, we will consider the legality of Agent Maroney's decision to refer Maestas to the secondary checkpoint.

## II. APPLICABILITY OF PRETEXT ANALYSIS

■ Although no individualized suspicion is required for border checkpoint stops under *United States v. Martinez-Fuerte*, 428 U.S. 543, 562, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116 (1976), this does not preclude the possibility that such a stop could be pretextual (although it might make such a claim difficult to prove).

*Martinez-Fuerte* itself suggests that pretext analysis could apply to border checkpoint cases, although the Court did not explicitly address the pretext issue. While the Court held that no *individualized* reason need exist to justify a border checkpoint stop, *see id.* at 563, 96 S.Ct. at 3085, it indicated that there may nevertheless be *impermissible* reasons for stopping particular motorists, *see id.* at 564 n. 17, 96 S.Ct. at

3085 n. 17.[1] The Court noted that relying on ethnicity as a factor in deciding who to stop might, under some circumstances, raise constitutional difficulties. *See Id.* Similarly, the majority contemplated the possibility of pretextual challenges to fixed checkpoints when it responded to the dissent's concern that the majority's holding would subject people of Mexican ancestry to undue harassment. The majority pointed out that, "upon a proper showing, courts would not be powerless to prevent the misuses of checkpoints [near the Mexican border] to harass those of Mexican ancestry." *Id.* at 567 n. 19, 96 S.Ct. at 3087 n. 19. These passages suggest that it is possible that an agent at a fixed checkpoint could stop a motorist for an impermissible reason—such as a motorist's race that is not relevant to the purpose of the checkpoint or an agent's desire to harass a motorist.

 Of course, an improper motive, by itself, does not render a stop pretextual. We apply an objective test to determine whether a stop made for an ostensibly legal reason is a pretext for what is, in reality, an impermissible reason: more specifically, we ask whether the officer *would* have made the stop in the absence of the invalid purpose. *United States v. Guzman,* 864 F.2d 1512, 1517 (10th Cir.1988). Thus, in order to prove that a stop is unreasonably pretextual, a defendant must show that the stop would not have occurred in the absence of an impermissible reason.[2]

Our reading of *Martinez–Fuerte* is consistent with other cases from the Tenth Circuit and from other circuits applying pretext analysis to border and non-border fixed checkpoints. The Ninth Circuit has twice explicitly considered challenges to fixed immigration checkpoints near the border and rejected them not because there can be no pretextual stops, but rather because of a failure of proof on the pretext issue. *See United States v. Koshnevis,* 979 F.2d 691, 694 (9th Cir.1992) (rejecting the defendant's argument that inspection at immigration checkpoint was a pretense for an allegedly improper purpose, holding that "[i]n the absence of affirmative evidence that [the agent] harbored [an improper purpose] in referring Koshnevis to secondary inspection ..., we will not require an agent to demonstrate articulable suspicion for an otherwise legitimate immigration stop"); *United States v. Barnett,* 935 F.2d 178, 181 (9th Cir.1991).

Similarly, this court and others have applied pretext analysis to driver's license checkpoints, which—like fixed immigration checkpoints near the border—permit stops in the absence of individualized suspicion.[3] *See, e.g., Texas v. Brown,* 460 U.S. 730, 743, 103 S.Ct. 1535, 1544, 75 L.Ed.2d 502 (1983) (plurality opinion) (noting that the circumstances surrounding stop at driver's license roadblock "give no suggestion that the roadblock was a pretext whereby evidence of a narcotics violation might be uncovered in 'plain view' in the course of a check for driver's licenses"); *United States v. Morales–Zamora,* 974 F.2d 149, 151 (10th Cir.1992) (holding that stop at driver's license checkpoint was invalid because it was a pretext to check for

---

1. As discussed later, improper motive alone is not a sufficient basis for finding pretext. *See* footnote 5 and accompanying text, *infra.* The defendant must also establish that he or she would not have been stopped in the absence of such improper motive. Thus, although improper motive is not sufficient to show pretext, it is an essential component of the pretext defense.

2. Admittedly, proving that one would not otherwise have been stopped at a fixed checkpoint would be very difficult for a defendant. It would, of course, be impossible to prove if *all* cars passing through a checkpoint were stopped. Even if some cars were permitted to pass without stopping, it would be difficult to prove pretext. The defendant would have to establish that whatever regular checkpoint criteria were in effect at the time she passed through the checkpoint

would not have caused her car to be stopped and that she was stopped solely because of the hidden, impermissible motive that caused the officers to single out her vehicle.

3. In *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979), the Supreme Court suggested in dicta that roadblock-type stops to check driver's licenses would be permissible even in the absence of articulable and reasonable suspicion that a driver was unlicensed. Likewise, in *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 453, 110 S.Ct. 2481, 2487, 110 L.Ed.2d 412 (1990), the court upheld a sobriety checkpoint, at which motorists were stopped and checked for intoxication in the absence of individualized suspicion, stating it was "for constitutional purposes indistinguishable" from the checkpoints in *Martinez–Fuerte.*

drugs); *United States v. McFayden,* 865 F.2d 1306, 1312 (D.C.Cir.1989) (rejecting the appellant's contention that driver's license roadblock was a subterfuge to catch drug dealers, but stating that a driver's license roadblock might be unconstitutional if it were such a subterfuge); *cf. Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 621 n. 5, 633, 109 S.Ct. 1402, 1415 n. 5, 1422, 103 L.Ed.2d 639 (1989) (holding that regulations permitting drug testing of railroad employees without individualized suspicion did not violate the Fourth Amendment and that absent a persuasive showing that the administrative testing scheme was a pretext to gather evidence for criminal prosecution, the Court would assess the regulations in light of their administrative purpose). We therefore believe that pretext analysis applies to border checkpoint stops, despite the lack of individualized suspicion required for such stops.

## III. THE INITIAL STOP

■ We next address the legality of the initial decision to stop Maestas at the fixed border checkpoint. In reviewing the district court's denial of a motion to suppress evi-

---

**4.** "The issue before this Court ... concerns the use of an otherwise valid checkpoint in a pretextual manner.... The issue does not concern the checkpoint in and of itself as being pretextual as recently considered in *United States v. Morales–Zamora,* 974 F.2d 149 (10th Cir.1992)." Aplt. Br. at 9.

**5.** We do not invalidate a stop merely because the officer's primary reason for making the stop is impermissible, but only if it *objectively* appears that, in the absence of that invalid reason, the officer *would not have made the stop. United States v. Morales–Zamora,* 974 F.2d 149 (10th Cir.1992), is not to the contrary. In *Morales,* the chief of police testified that the primary purpose of a roadblock was to check vehicles for drugs, not driver's licenses. 974 F.2d at 152. There, although the police legally could have set up a roadblock to check driver's licenses, *see Sitz,* 496 U.S. at 455, 110 S.Ct. at 2487; *Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401, it was objectively unlikely that the defendant would have been stopped, given that the primary purpose of the roadblock was to check vehicles for drugs (without regard to the presence or absence of reasonable suspicion) rather than a desire to check for licenses.

Maestas contends that we should apply the objective test enunciated by Professor Wayne La-Fave and cited in *Guzman.* According to Profes-

---

dence, we must accept the court's factual findings unless they are clearly erroneous and must consider the evidence in the light most favorable to the government. *United States v. Abreu,* 935 F.2d 1130, 1132 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991). The ultimate question of whether a search and seizure was reasonable under the Fourth Amendment is a question of law that we review de novo. *Id.*

Maestas explicitly states that she is not challenging the validity of the fixed checkpoint itself.[4] Rather, she argues only that the receipt by the agents of information from the roving border patrol rendered the stop at the "otherwise valid checkpoint" to be pretextual and a mere surrogate for an unsupportable roving stop.

■ As we noted earlier, we apply an objective test to determine whether a mixed-motive stop is improper: we ask not whether the officer *could* have validly made the stop, but instead whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose. *Guzman,* 864 F.2d at 1517.[5]

---

sor LaFave, "the proper basis of concern is not with *why* the officer deviated from the usual practice in this case but simply that he *did* deviate." *Guzman,* 864 F.2d at 1517 (citing 1 Wayne LaFave, Search and Seizure, § 1.4(e) at 94 (1987)). Maestas cites this "deviation test" and urges us to apply it to the roving agents' actions. She suggests that the roving patrol officers deviated from routine practice by transmitting information to the fixed checkpoint and by standing by at the checkpoint while Maestas was questioned and her car searched. Although the deviation test may be helpful in objectively analyzing the agents' actions, it is not terribly probative on the issue of whether Maestas would have been stopped in the absence of the invalid reason, given the lack of evidence in this case. That is, if there were evidence that the agents were stopping all cars going through the checkpoint on the day Maestas was stopped, the fact that there was a deviation from usual routine when the roving patrol transmitted information to the fixed checkpoint would be of little moment, since Maestas would have been stopped regardless of the information received by the checkpoint agents. On the other hand, if the agents at the fixed checkpoint were, for example, only stopping every tenth car, then the roving patrol agents' actions might be relevant if Maestas was stopped even though she was the sixth car to pass through the checkpoint.

Accordingly, the relevant question is whether the agents at the fixed checkpoint would have stopped Maestas in any event, even if she had not been singled out for what is alleged to have been a roving, individualized stop masquerading as a routine border stop. Unfortunately, the record is silent on this issue. There is no evidence in the record as to what criteria the border patrol agents were using in deciding whom to stop on the day Maestas was stopped. Nor is there any evidence whether or not all cars were being stopped that day. Thus, the key question then becomes who bears the risk of no evidence—that is, who had the burden of proof at the hearing on the issue of pretext.

■ We believe that the defendant bears the burden of proving that a legally sufficient basis asserted as a justification for a search or seizure was pretextual.[6] The burden of proving other issues in the context of constitutional challenges to searches and seizures is well established. As a general matter, "if the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution." 1 Wayne LaFave, Criminal Procedure § 10.4, at 790 (1984). Thus, the defendant has the burden of proving that a warrant was invalidly issued in reliance on a deliberately or recklessly false affidavit. *Franks v. Dela-*

*ware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978); *United States v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 874 (10th Cir.1992); *United States v. Corral-Corral,* 899 F.2d 927, 933 (10th Cir.1990). On the other hand, when the defendant challenges a warrantless search or seizure the government carries the burden of justifying the agents' actions. *United States v. Finefrock,* 668 F.2d 1168, 1170 (10th Cir. 1982) (citing *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). In other words, the government has the burden of proving that an exception to the warrant requirement applies. *See, e.g., Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984) (holding that the government has the burden of proving inevitable discovery); *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) (holding that the government has the burden of proving an exception to the warrant requirement and discussing the search-incident-to-arrest exception, the automobile exception, and the plain-view-seizure exception); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (stating in traffic stop case that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion [under the Fourth Amend-

---

6. Most cases addressing the pretext issue address only implicitly the burden of proof question, usually by noting that there is evidence in the record of a legitimate reason for the stop or arrest and that there is no evidence in the record to the contrary. *See, e.g., United States v. Martinez,* 983 F.2d 968, 972 (10th Cir.1992) (upholding traffic stop where evidence showed officer usually pulled over slow-driving vehicles in the left lane of highways and the defendant "put[] forth no evidence that convinces us otherwise"), *cert. denied,* —— U.S. ——, 113 S.Ct. 2372, 124 L.Ed.2d 277 and —— U.S. ——, 113 S.Ct. 1959, 123 L.Ed.2d 662 (1993); *United States v. Horn,* 970 F.2d 728, 731 (10th Cir.1992) (holding that traffic stop for violation of Utah's license plate rule and seat belt law was not pretextual, given that "there is no evidence in the record that the trooper made the stop for any reason other than" the traffic violations); *United States v. Erwin,* 875 F.2d 268, 272 (10th Cir.1989) (holding that traffic stop for speeding was not pretextual because the overwhelming objective evidence showed that a reasonable New Mexico officer would have stopped the defendant, "and nothing in the rec-

ord is to the contrary"); *Barnett,* 935 F.2d at 181 (placing on the defendants the burden of producing some evidence to raise the issue of pretext where the evidence in the record showed the stop was a legitimate immigration stop); *United States v. Lewis,* 910 F.2d 1367, 1371 (7th Cir. 1990) (holding that officer's stop of the defendant for running a stop sign was valid even though the citation listed an intersection at which there was no stop sign, because there was evidence that the defendant had run *a* stop sign, and rejecting the defendant's pretext argument on the ground that "no pretext has been shown"); *United States v. Boucher,* 909 F.2d 1170, 1173 (8th Cir.) (holding that the evidence showed that the defendant was stopped for speeding and that nothing in the record suggested that the finding was erroneous or that the stop was pretextual), *cert. denied,* 498 U.S. 942, 111 S.Ct. 350, 112 L.Ed.2d 314 (1990). Admittedly these cases are not conclusive as to which party bears the burden of proof on the issue of pretext; however, they at least suggest that the courts view the burden of proof on that issue to lie with the defendant.

ment]"); *United States v. Anderson,* 981 F.2d 1560, 1567 (10th Cir.1992) (holding the government has the burden of proving exigent circumstances); *United States v. Ibarra,* 955 F.2d 1405, 1409, 1410 (10th Cir.1992) (holding that the government has the burden of proving that the impoundment of the defendant's car without a warrant was authorized under Wyoming law or Supreme Court precedent); *Corral–Corral,* 899 F.2d at 932 (holding that the government has the burden of proving that its agents' reliance upon an invalid warrant was objectively reasonable under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).

A defendant who seeks to challenge a search or seizure that otherwise has been justified by the government on the ground that the asserted justification is pretextual stands in the same position as a defendant who seeks to challenge the validity of a search pursuant to a warrant on the basis that the warrant is invalid. Once a search or seizure is shown to have satisfied the requirements of a warrant or one of the exceptions to a warrant, it is prima facie constitutional, and the burden of proving the invalidity of the warrant or the pretextual nature of the exception relied upon is placed on the defendant.

Here, Maestas could have questioned the agents as to whether all cars were being stopped on the day that she was stopped. She also could have requested copies of any written Border Patrol policies concerning the operation of the Truth or Consequences checkpoint in order to assess whether the stop would indeed have occurred in the absence of the allegedly invalid purpose to search for drugs. But she did not.

Maestas has clearly failed to meet her burden of proving that her stop at the primary inspection area of the checkpoint was pretextual. Although she points to the presence of the roving patrol officers at the fixed checkpoint and to their decision to notify the checkpoint agents about her actions that suggested she was smuggling drugs, this evidence by itself does not help us to resolve the question of whether Maestas would have been stopped at the checkpoint in any event. We therefore hold that the district court did not err in finding the initial stop of Maestas constitutional.

The concurrence suggests that our holding will lead to the illogical result that it is permissible to stop a motorist at a fixed checkpoint for no reason, but that it is improper to stop the motorist if the border patrol agent has information about the motorist from some other source. That is not the result of our holding. If the stop is genuinely a fixed checkpoint stop (rather than a pretext for a roving stop), it is permissible to stop the motorist for no reason, and the existence of properly obtained information particular to that motorist certainly would not render such a stop invalid. However, as this issue is phrased by the concurrence, it begs the question, which is whether the stop is truly a fixed checkpoint stop or merely a pretext for a roving patrol stop. Just because the stop physically occurs at a fixed checkpoint does not compel the conclusion that the stop was necessarily a fixed checkpoint stop.

■ A fixed checkpoint is accepted because of a number of procedural safeguards that accompany it, the primary safeguard being the routine nature of the stop. However, if Maestas would not have been stopped under the routine in effect on the day that she was stopped, but rather was stopped only because of the information peculiar to her that was received and transmitted to the fixed checkpoint by roving officers, then in fact the stop becomes a particularized stop that must meet the standards of a roving stop, even though it occurred at a fixed checkpoint. Whether Maestas' stop should be regarded as a bona-fide fixed checkpoint stop, and evaluated under the rules applicable to such stops, or whether it should be regarded as only a pretextual fixed checkpoint stop that was, in reality, a roving stop, is the central issue raised on appeal by Maestas. In our judgment her appeal cannot be disposed of without addressing that issue.

## IV. THE REFERRAL TO THE SECONDARY CHECKPOINT

■ Maestas also appears to challenge her referral to the secondary check-

point as pretextual.[7] This claim too must fail. Agent Maroney asked for and received Maestas' consent to search while she was still at the primary checkpoint. Consequently, her consent to search justified Agent Maroney's decision to refer her to the secondary checkpoint. *See Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. at 3087 (stating that further detention may be justified by consent).

Despite Maestas' consent, the evidence obtained from the resulting search might be excludable if the consent was obtained during an illegal detention. *United States v. Turner,* 928 F.2d 956, 957 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991). In this case, however, neither the decision to stop Maestas nor the questioning of Maestas on non-immigration topics rendered her detention illegal.

As to the legality of the stop, we have already held that there is no evidence that the decision to stop Maestas in particular at the fixed checkpoint was pretextual. Nor does Maestas contend that the checkpoint in general was pretextual or invalid. Therefore, the initial stop was not illegal and could not invalidate Maestas' consent.

Nor did Agent Maroney's questioning render the detention illegal. In *Guzman,* we held that an officer making a traffic stop must have reasonable suspicion to question a motorist about matters other than those relating to the reason for which the stop was made. *Guzman,* 864 F.2d at 1518–19. However, *Guzman* does not preclude the types of questions Agent Maroney asked here.

Unlike *Guzman,* the non-immigration related questions here were permissible because they were within the scope of the checkpoint stop. Once Maestas was properly stopped at the fixed checkpoint, Agent Maroney was entitled to question her about suspicious circumstances. "Police officers are not required to close their eyes to indications of possible wrongdoing that are disclosed at roadblocks." *United States v. Diaz–Albertini,* 772 F.2d 654, 658 (10th Cir.1985), *cert.*

*denied,* 484 U.S. 822, 108 S.Ct. 82, 98 L.Ed.2d 45 (1987). "Border patrol agents may 'question individuals regarding suspicious circumstances, in addition to citizenship matters, when those individuals are stopped at a permanent checkpoint.' " *United States v. Sanders,* 937 F.2d 1495, 1499 (10th Cir. 1991) (quoting *United States v. Benitez,* 899 F.2d 995, 998 (10th Cir.1990)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); *see United States v. Johnson,* 895 F.2d 693, 696 (10th Cir.1990); *United States v. Espinosa,* 782 F.2d 888, 891 (10th Cir.1986); *see also United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (stating in roving Border Patrol case that an officer "may question the driver and passengers about their citizenship and immigration status, *and* he may ask them to explain suspicious circumstances") (emphasis added). Because law enforcement officers are permitted to pool information to establish the requisite quantum of suspicion, it is of no consequence that one of the suspicious circumstances about which she was questioned (whether she was traveling with the other two cars) was observed by the roving agents and communicated to the fixed checkpoint. *See United States v. Salinas–Calderon,* 728 F.2d 1298, 1301–02 (10th Cir.1984) (stating in dicta that law enforcement officers may pool their information to establish probable cause); *United States v. Torres,* 663 F.2d 1019, 1022 (10th Cir.1981) (holding that law enforcement officers were entitled to rely on information supplied by other officers to establish probable cause), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2237, 72 L.Ed.2d 847 (1982); *United States v. Salinas–Garza,* 803 F.2d 834, 838 (5th Cir.1986) (holding that Drug Enforcement Agency agent could give customs agent reasonable suspicion sufficient for a stop by sharing information about the defendant). Thus, the questioning of Maestas was within the scope of the checkpoint stop and did not render her detention illegal or her consent to

---

7. We have recently noted that the courts must look at the overall length and circumstances of detention and that it is not legally relevant whether the entire detention occurred at one

location or two closely related locations. *See United States v. Rascon–Ortiz,* 994 F.2d 749 (10th Cir.1993); *United States v. Ludlow,* 992 F.2d 260, 264 (10th Cir.1993).

search invalid.[8]

Given that neither the initial stop nor the referral of Maestas to the secondary checkpoint violated the Fourth Amendment, it follows that the marijuana found in her car and her subsequent confession that it was hers were not fruit of the poisonous tree under *Wong Sun,* 371 U.S. at 484–88, 83 S.Ct. at 415–18, and *Recalde,* 761 F.2d at 1459. Consequently, the district court properly refused to suppress the evidence. We therefore AFFIRM the judgement of the district court.

STEPHEN H. ANDERSON, Circuit Judge, concurring in part and dissenting in part.

I concur in the disposition of this case. I write separately, however, first because I believe that a pretext analysis is unnecessary; and second, because pretext is simply inapplicable to the stop of a vehicle at a fixed border checkpoint. I therefore do not join Part II of the majority opinion and those portions of Part III which apply a pretext analysis to the stop of Maestas' vehicle.

### I.

The majority's pretext analysis is unnecessary to the disposition of this case. As I understand it, the majority concludes that the result is controlled by the fact that all cars were being stopped on the day in question. Therefore, the result would be the same, I believe, regardless of the burden of proof or pretext analysis. All the majority needed to do is declare that a discussion of proof or pretext is unnecessary because the result would be the same regardless.

### II.

The Fourth Amendment requires that seizures of vehicles be evaluated under a balancing test, weighing the "public interest against the Fourth Amendment interest of the individual." *United States v. Martinez–Fuerte,* 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976); *see also United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *United States v. Ludlow,* 992 F.2d 260, 262

(10th Cir.1993). In the case of fixed border patrol checkpoints, the public interest is strong and compelling.

"It has been national policy for many years to limit immigration into the United States." *Martinez–Fuerte,* 428 U.S. at 551, 96 S.Ct. at 3080. Particularly troublesome is the interdiction of "illegal entrants from Mexico [which] poses formidable law enforcement problems." *Id.* at 552, 96 S.Ct. at 3080. While the government's interest in protecting the nation's borders is at its zenith at the actual borders or their functional equivalents, and the scope of the government's ability to search and seize persons and vehicles crossing those borders is therefore broadest, the same compelling interest permits the establishment of fixed border checkpoints located within 100 air miles of the United States–Mexico border, such as the one at Truth or Consequences involved in this case. These checkpoints also play an integral role in interdiction efforts, "because the flow of illegal aliens cannot be controlled effectively at the border." *Id.* at 556, 96 S.Ct. at 3082.

While the parties have not included in the record in this case any information about the method of operation of the fixed checkpoint at Truth or Consequences, the Supreme Court has described a similar fixed checkpoint as follows:

"Approximately one mile south of the checkpoint is a large black on yellow sign with flashing yellow lights over the highway stating 'ALL VEHICLES, STOP AHEAD, 1 MILE.' Three-quarters of a mile further north are two black on yellow signs suspended over the highway with flashing lights stating 'WATCH FOR BRAKE LIGHTS.' At the checkpoint, which is also the location of a State of California weighing station, are two large signs with flashing red lights suspended over the highway. These signs each state 'STOP HERE—U.S. OFFICERS.' Placed on the highway are a number of orange traffic cones funneling traffic in to two lanes where a Border Patrol agent in full dress uniform, standing behind a white on red 'STOP' sign checks traffic. Block-

---

8. Maestas does not on appeal contest the voluntariness of her consent.

ing traffic in the unused lanes are official U.S. Border Patrol vehicles with flashing red lights. In addition, there is a permanent building which houses the Border Patrol office and temporary detention facilities. There are also floodlights for nighttime operation."

*United States v. Ortiz,* 422 U.S. 891, 893, 95 S.Ct. 2585, 2587, 45 L.Ed.2d 623 (1975) (quoting *United States v. Baca,* 368 F.Supp. 398, 410–11 (S.D.Cal.1973)). I have no reason to believe that the Truth or Consequences checkpoint is operated in any substantially different way. Perhaps more to the point, the majority opinion cannot show otherwise from the record.

Balanced against the strong public interest in protecting our nation's borders is the intrusion on the Fourth Amendment interests of the travelling public occasioned by fixed border checkpoints. The Supreme Court has acknowledged that that intrusion is "quite limited":

> The stop does intrude to a limited extent on motorists' right to "free passage without interruption," *Carroll v. United States,* 267 U.S. 132, 154 [45 S.Ct. 280, 285, 69 L.Ed. 543] (1925), and arguably on their right to personal security. But it involves only a brief detention of travelers during which
>
>> " '[a]ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States.' "

*Martinez–Fuerte,* 428 U.S. at 557–58, 96 S.Ct. at 3083 (quoting *Brignoni–Ponce,* 422 U.S. at 880, 95 S.Ct. at 2579). Indeed, as the Court further acknowledged, "this practice of stopping automobiles briefly for questioning has a long history evidencing its utility and is accepted by motorists as incident to highway use." *Id.* at 561 n. 14, 96 S.Ct. at 3084 n. 14.

In view of this compelling and substantial governmental interest in monitoring the flow of entrants over our borders and the slight intrusion caused by the brief detention of vehicles at fixed border checkpoints, individ-

ualized suspicion is not required for such checkpoint stops. *Id.* at 562, 96 S.Ct. at 3085; *see also Ludlow,* 992 F.2d at 263. Nor is individualized suspicion required for selective referral to a secondary inspection area. *Martinez–Fuerte,* 428 U.S. at 563, 96 S.Ct. at 3085; *Ludlow,* 992 F.2d at 263; *United States v. Ray,* 973 F.2d 840, 842 (10th Cir. 1992). In short, Border patrol agents may stop *any* car at the fixed border checkpoint, and may refer *any* car for secondary inspection. Indeed, when the checkpoint is in operation, *all* cars are effectively "seized" by virtue of having to pass through the checkpoint, and having to stop or slow down to a rolling stop at the stop sign.

The mechanism which prevents abuses of this largely unfettered discretion to stop vehicles at border checkpoints "lies in appropriate limitations on the scope of the stop." *Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. at 3087. Accordingly, "Border Patrol agents may question occupants of a vehicle concerning citizenship and customs matters and ask them to explain suspicious circumstances or behavior." *Ludlow,* 992 F.2d at 264; *United States v. Pinedo–Montoya,* 966 F.2d 591, 593–94 (10th Cir.1992). They may not, however, routinely search cars or occupants of cars or ask wide-ranging questions about other criminal conduct and "visual inspection of the vehicle is limited to what can be seen without a search." *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083.

Pretext is simply inapplicable to such border checkpoint stops. "[A] pretextual stop occurs when the police use a legal justification to make a stop ... in order to search a person or his vehicle, or interrogate him, for an unrelated and more serious crime for which they do not have the reasonable suspicion necessary to support a stop." *United States v. Morales–Zamora,* 974 F.2d 149, 152 (10th Cir.1992). In the case of fixed border checkpoints, *all* cars are briefly and routinely stopped.[1] No reasonable suspicion is necessary. Thus, the border patrol agents' motivation or reasons for stopping and briefly

---

1. Indeed, the district court in this case observed that, "[i]t appears that on the afternoon that Maestas was stopped at the checkpoint, everyone

regardless of reasonable suspicion, had to pull off I–25 and go through the checkpoint." Memorandum and Order at 8, R. Vol. I, Doc 37.

questioning the occupants of a particular vehicle are irrelevant.

With the possible exception of two Ninth Circuit cases, the majority cites no other circuit or district court case adopting the position it takes, and my research reveals no such case applying a pretext analysis to a fixed checkpoint stop.

Even the two Ninth Circuit cases, *United States v. Koshnevis*, 979 F.2d 691, 694 (9th Cir.1992), and *United States v. Barnett*, 935 F.2d 178, 181 (9th Cir.1991), are equivocal. *Barnett*, upon which *Koshnevis* relies, only states:

> Had [defendants] offered affirmative evidence that the first agent harbored a subjective purpose to refer to secondary inspection for drug-related offenses, *we would be required to address the applicability of the cases that deal with "pretextual" seizures to the type of stop authorized by Martinez–Fuerte.* But in the absence of that evidence, *we need not reflect upon the applicability of Martinez–Fuerte to referrals where it appears that the referral is only (or even partially) for drugs.*

*Barnett*, 935 F.2d at 181 (other citations omitted).

The majority therefore attempts to find justification for engaging in its pretext analysis from dicta in *Martinez–Fuerte*, and from a few cases involving entirely different factual settings with an entirely different balance between governmental and individual Fourth Amendment interests.

With regard to the *Martinez–Fuerte* dicta, the majority observes that "[t]he Court noted that relying on ethnicity as a factor in deciding who to stop might, under some circumstances, raise constitutional difficulties." Maj. op. at 1489 (citing *Martinez–Fuerte*, 428 U.S. at 564 n. 17, 96 S.Ct. at 3085 n. 17). However, in footnote 17 of *Martinez–Fuerte*, all the Court did was observe that it had held previously that "apparent Mexican ancestry by itself could not create the reasonable suspicion required for a *roving-patrol* stop." *Id.* (emphasis added) (citing *United States v.*

*Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). There is no question here of a roving-patrol stop; Maestas was stopped at a fixed border checkpoint.[2]

I find equally unpersuasive the majority's reliance on the dicta in *Martinez–Fuerte* that "upon a proper showing, courts would not be powerless to prevent the misuse of checkpoints [near the Mexican border] to harass those of Mexican ancestry." *Id.* at 567 n. 19, 96 S.Ct. at 3087 n. 19. The misuse of border checkpoints to impermissibly harass an entire ethnic group is completely different from, and in no way supports, the notion that the subjective motivation of a border patrol agent in stopping any particular vehicle at a border checkpoint could render such a stop pretextual.

Additionally, the cases from our circuit and other circuits upon which the majority relies are distinguishable. In *Morales–Zamora*, the issue was whether the entire driver's license checkpoint was invalid as pretextual because it was admittedly established to search for cars carrying drugs, not for cars with unlicensed drivers. By contrast, Maestas does not dispute the validity of the fixed border checkpoint—she only challenges the particular decision to stop her car. Similarly, the District of Columbia Circuit in *United States v. McFayden*, 865 F.2d 1306, 1312 (D.C.Cir.1989), addressed an allegation that the entire temporary driver's license checkpoint was a subterfuge to catch drug dealers. That, again, is an entirely different proposition from what is before us in this case. *Texas v. Brown*, 460 U.S. 730, 743, 103 S.Ct. 1535, 1544, 75 L.Ed.2d 502 (1983) (plurality opinion), is similarly distinguishable, and, importantly, *none* of these cases involves the undeniably strong and compelling immigration control interest present in the case of a fixed border checkpoint.

Finally, the inapplicability of a pretext analysis to border checkpoint stops is highlighted by considering the consequence of applying it to such stops. If pretext applies, then a vehicle could be stopped at the checkpoint, and/or referred to secondary, routinely

---

**2.** We reject Maestas' argument that she was really stopped by a roving border patrol using a fixed border checkpoint as its surrogate.

along with all vehicles, or by random selection, or in accordance with some arbitrary selection protocol (i.e. every tenth car), or on the hunch or whim of the border patrol agent, but it could not be stopped if the border patrol agent has some information about the vehicle from some other source. This seems to me to be illogical at best, and unworkable in theory or in practice.